## PAULA GERMAIN vs. THERESA A. GIRARD.

No. 07-P-811.

Worcester. April 17, 2008. - August 21, 2008.

Present: RAPOZA, C.J., KAFKER, & GREEN, JJ.

*Will*, Undue influence. *Practice, Civil,* Presumptions and burden of proof, Offer of proof. *Fiduciary. Undue Influence.*

In a will contest in which the defendant claimed that the plaintiff's husband exercised undue influence over the decedent in the execution of a will and the creation of a trust, the probate judge erred in placing on the defendant the burden of establishing her claim, where the judge's subsidiary findings left no doubt that the plaintiff's husband stood in a fiduciary capacity toward the decedent in the preparation of his will and related documents, and that the husband stood to benefit from the transaction, as his wife was a named beneficiary of the will and the trust. [412-415]

In a will contest, the defendant failed to demonstrate prejudice resulting from the probate judge's evidentiary ruling and his finding concerning the decedent's testamentary capacity. [415]

PETITION for probate of will filed in the Worcester Division of the Probate and Family Court Department on September 2, 2005.

The case was heard by *Gregory V. Roach,* J.

*David A. Wallace (David I. Shorr* with him) for the defendant.

*Francis J. Russell* for the plaintiff.

GREEN, J. While hospitalized shortly before his death in November of 2004, George R. Girard (George) executed a last will and testament to replace his previous will, executed in 1983. At the time of his death, the most valuable asset in George's estate was thought to be the anticipated proceeds from a lawsuit he had filed seeking damages for personal injuries suffered from his exposure to asbestos.[1] Under the terms of the 2004 will,

---

[1]During his life, George had worked as a carpenter, exposing him to asbestos. In May 2004, he was diagnosed with a form of cancer that can be caused by asbestos exposure.

George left the bulk of his estate to a trust, which designated his wife, the defendant Theresa A. Girard (Theresa), as the principal beneficiary during her lifetime and one of his wife's daughters, the plaintiff Paula Germain (Paula), as the trustee.[2] Under the terms of the trust, Paula was to exercise discretionary control over distributions made from the trust for Theresa's benefit and held a significant remainder interest in any trust assets remaining upon Theresa's death. Though Paula's husband, Alan Germain (Alan), enjoyed George's trust and confidence, conducted all of the communications with the attorney who prepared the will, and stood (by virtue of Paula's remainder interest in the trust) to benefit from the will, the trial judge erroneously imposed on Theresa the burden of establishing her claim of undue influence in her challenge to the 2004 will. See *Cleary* v. *Cleary*, 427 Mass. 286, 293 (1998). We accordingly vacate the judgment approving the 2004 will and remand the case for further proceedings.

*Background.* George and Theresa married in 1971. In 1983, George executed a will that left his entire estate to Theresa outright, if she survived him.[3] During their marriage, George generally handled their finances. Following George's retirement in 1994, George and Theresa began spending three to six months each year in Florida; while they were in Florida, Alan paid their household expenses using blank checks George had signed and left with him before departing for Florida. George did not have a close relationship with his own biological children, but was very close to Theresa's children. Alan and Paula were generous to George and Theresa, and made various substantial gifts to them over the years.[4]

In May 2004, George was diagnosed with stage IV mesothelioma, a deadly form of lung cancer that can be caused by ex-

---

[2]Theresa was George's second wife, and they had no children together. Paula is Theresa's daughter from a previous marriage. Theresa had two additional children from the previous marriage. George had four children from a previous marriage.

[3]If Theresa predeceased him, the 1983 will devised George's annuity fund and benefits to his children, and his real estate and other assets to Theresa's children.

[4]Gifts included money, a new car, and renovations to the couple's Upton home.

posure to asbestos. After receiving that diagnosis, George hired an attorney from Connecticut (whom Alan introduced to him) to initiate a lawsuit for his injuries from asbestos exposure. The attorney informed him that the suit could yield a significant settlement or judgment, possibly exceeding one million dollars. George discussed with Alan his wish to direct the proceeds of any such settlement or judgment to a trust for the benefit of Theresa during her life, with any trust assets remaining upon her death to be distributed in equal amounts of up to $10,000 to each of Alan and Paula's four children, and any amount remaining after those distributions to be divided between Paula (sixty-five percent) and her brother Anthony MacWilliams (thirty-five percent).[5] Paula was to be named as trustee of the trust. George's other assets were to pass in equal shares to Theresa's three children, including Paula. George's four children from his previous marriage, who were beneficiaries of George's 1983 will (see note 3, *supra*), were to take nothing under the 2004 will or the trust.

At George's request, Alan (by electronic mail [e-mail], on November 5, 2004) contacted Attorney Scott Fenton of Bowditch & Dewey, a Worcester law firm that had previously represented Alan and Paula in a variety of personal and business matters, to prepare an estate plan with provisions for the anticipated proceeds from the lawsuit. Alan conducted all communications with Bowditch & Dewey concerning George's estate plan, initially with Fenton and later with Attorney Maryjo Hart (who prepared the estate planning documents). On November 10, 2004, Alan sent an e-mail to Fenton asking whether the documents were ready for signature, explaining that "George is going fast and I want him to sign." The November 10 e-mail furnished further instructions regarding the trust established for the proceeds from the asbestos lawsuit: "Paula Germain shall controll [*sic*] the trust and have full say in how the money is used to take care of George and Theresa Girard. Upon the death of George and Theresa the trust shall be liquidated and [thirty-five percent] goes to Anthony MacWilliams and the remainder to Paula Germain of course after the trust has paid all debts."

A short time thereafter, during the early morning hours of

---

[5] A third sibling, Carol Stockton, was to take nothing under the trust.

November 12, 2004, George became extremely short of breath and was taken to the hospital by ambulance. He was stabilized with oxygen, morphine, steroids, and antibiotics. Between 10:00 and 11:00 that morning, Attorney Hart arrived at the emergency room with the completed estate planning documents.[6] Hart had neither met nor spoken with George or Theresa before arriving at the hospital on that occasion.[7] After Hart explained the documents to George and Theresa, they signed them, in the presence of two witnesses from Hart's law office. George died just over two weeks later, on November 25, 2004.

On July 14, 2005, Theresa filed a petition to probate George's 1983 will. Paula entered an appearance in that action and filed an affidavit of objections. On or about August 23, 2005, Theresa filed a verified equity complaint seeking to have the 2004 will and related trust documents declared null and void. On September 2, 2005, Paula filed a petition to probate George's 2004 will.

The petitions for the probate of the two wills were tried by a probate judge over a period of six days in 2006. The judge entered extensive findings of fact and concluded that the 2004 will was not the product of undue influence. A judgment entered approving and allowing the 2004 will as the final will of George R. Girard. Two separate judgments entered dismissing (1) Theresa's petition for probate of the 1983 will and (2) Theresa's August 23, 2005, complaint in equity. Theresa filed a notice of appeal from the judgment approving the 2004 will as George's last will and testament.

*Discussion.* "In a will contest involving allegations of undue influence, the burden of proof ordinarily rests with the party contesting the will." *Estate of Moretti*, 69 Mass. App. Ct. 642, 651 (2007), citing *Tarricone* v. *Cummings*, 340 Mass. 758, 762 (1960). However, in cases involving a fiduciary, "the fiduciary who benefits in a transaction with the person for whom he is a fiduciary bears the burden of establishing that the transaction

---

[6]The documents included wills for George and Theresa, durable powers of attorney and health care proxies for George and Theresa, and the trust described above.

[7]Alan had previously informed Hart that George was "too sick" to speak with her over the telephone. The record does not indicate whether Hart asked to communicate directly with Theresa.

did not violate his obligations." *Cleary* v. *Cleary*, 427 Mass. at 295.[8]

"Although some fiduciary relationships, such as that between guardian and ward, are created by law, others arise from the nature of the parties' interactions. The 'circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case.' " *Doe* v. *Harbor Schs., Inc.*, 446 Mass. 245, 252 (2006), quoting from *Warsofsky* v. *Sherman*, 326 Mass. 290, 292 (1950). "Where the fiduciary relationship is not one created by law, the existence of the relationship ordinarily is a mixed question of law and fact for which the party asserting the relationship bears the burden." *Ibid.* Though the trial judge did not address Theresa's argument that Alan was a fiduciary in fact, if not by strict formal arrangement, the judge's subsidiary findings leave no doubt that Alan stood in a fiduciary capacity toward George in the preparation of George's 2004 will and related documents. The judge found that George placed his trust and confidence in Alan, based upon a close relationship over ten years. George trusted Alan to manage his household affairs and expenses while George and Theresa were in Florida for significant portions of the year. Of even greater significance with reference to the present case, George entrusted to Alan all responsibility for overseeing the preparation of his 2004 will and related documents, and George's deteriorating health left him wholly dependent on Alan's assistance toward that end.

There is likewise no doubt that Alan stood to benefit from the transaction in which he was involved. Though Alan was not named a beneficiary under the will or the trust, his wife, Paula, was. Under the principles enunciated in *Cleary* v. *Cleary, supra,* his status as a fiduciary subjects his actions to heightened scrutiny.

---

[8]A narrow exception to the *Cleary* rule arises in circumstances where the fiduciary has not taken part in the questioned transaction. See *Rempelakis* v. *Russell*, 65 Mass. App. Ct. 557, 563 (2006). In imposing the burden of establishing undue influence on Theresa, the trial judge relied on *Rempelakis*, noting that Paula played no active role in preparing George's 2004 estate-planning documents. The judge appears to have considered Paula a fiduciary by virtue of her designation as trustee of the trust established to receive the anticipated proceeds of the asbestos suit.

Though Alan was not a party to the petition (by reason of the fact that he was not a beneficiary under the will), in circumstances where a fiduciary stands to receive a benefit indirectly we see no reason why the burden shifting prescribed by *Cleary* v. *Cleary* should not be applied to the direct beneficiary (here Paula) from whom the fiduciary's (here Alan's) indirect benefit derives. Accordingly, under *Cleary* v. *Cleary, supra,* the judge should have placed on Paula the burden of establishing that Alan did not exert undue influence on George in connection with the 2004 will and trust.

"Four considerations are usually present in a case of undue influence: 'that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means.' " *O'Rourke* v. *Hunter,* 446 Mass. 814, 828 (2006), quoting from *Tetrault* v. *Mahoney, Hawkes & Goldings,* 425 Mass. 456, 464 (1997). There was evidence in the record that would enable a rational trier of fact to find that each of the four considerations was present. Though the trust expressly provided that its purpose was to ensure that Theresa's needs were met during her lifetime, it vested exclusive discretion in Paula, as trustee, over the amounts, purposes, and timing of payments from the trust. Though Theresa was somewhat unsophisticated in financial matters, there is no indication in the record that she was a spendthrift. The judge's findings furnish no explanation why the imposition of a trust, vesting sole discretion in Paula over distributions, was necessary or appropriate to achieve George's stated objectives, in contrast to the terms of his 1983 will (which devised his entire estate to Theresa outright), or in contrast to a trust that gave Theresa the right to demand distributions from time to time.[9] Moreover, Paula's dual roles as trustee and remainderman create an obvious conflict of interest which,

---

[9]Though the judge found that the 2004 estate planning documents were designed to minimize tax consequences, the judge conducted no analysis of why the particular structure was chosen, or whether or how it accomplished the objective of tax avoidance. For example, he conducted no analysis whether a trust was necessary (based on the anticipated size of George's estate), in order to achieve the desired tax savings, or whether the trust needed to vest exclusive discretion over distributions in Paula. Moreover, the judge's find-

though not improper per se, created an incentive for her to preserve rather than distribute the trust corpus. George's rapidly deteriorating health, combined with the absence of any direct communication between him and the attorneys preparing his will, left him vulnerable to Alan's influence, and Alan's role in initiating contact with his own attorneys, and thereafter conducting all communications with them, clearly gave him the opportunity to exert such influence.

Because the trial judge placed the burden of proof on the wrong party, and because there was evidence to support a contrary conclusion, his conclusion that there was no undue influence cannot stand.

*Other issues.* We address briefly Theresa's other claims of error. First, Theresa cannot sustain her claim that the judge erred in refusing to allow Dr. Howard Sachs to offer his opinion regarding George's testamentary capacity to execute the 2004 will and related documents, because she made no offer of proof at trial to indicate what his testimony would have been. Absent an offer of proof, she cannot demonstrate that she suffered any prejudice as a result of the challenged evidentiary ruling. See *W.A. Robinson, Inc.* v. *Burke,* 327 Mass. 670, 677 (1951); *Commonwealth* v. *Blake,* 409 Mass. 146, 158-159 (1991); Brodin & Avery, Massachusetts Evidence § 1.3.4. (8th ed. 2007). Her contention that the judge erred in finding that George possessed testamentary capacity fails as well; to the extent the contention rests on her assertion that Dr. Sachs's excluded testimony would have dictated a contrary conclusion, it rests on speculation (in the absence of an offer of proof) concerning what his testimony would have been.

*Conclusion.* The judgment is vacated, and the case is remanded to the Probate and Family Court for further proceedings consistent with this opinion.

*So ordered.*

---

ings are silent on whether the sought-after tax savings would occur in the probate of George's estate, or later, upon Theresa's death.